May it please the Court, Mason Morissette for the Talalip Tribes. This is a case in the ongoing saga of treaty fishing rights in the Northwest that saga started by the Honorable Judge George Bolt many years ago. In this case we're dealing with an intertribal problem and I need to mention I'm assisted by Rebecca Jackson of my firm who's with me on the brief. In an area that is clearly what we call the Talalip front yard. Now I've handed up ER 45 I believe. It's a locator map. As I know these areas are sometimes somewhat obscure. This is the one that shows a number of Did you say 45 or 65? 45 I believe. Oh here it is. I got it. It's part of the Washington Department of Fisheries fishing areas. And we're talking in this case roughly about the southeastern area of what's labeled there 8A and 8D. This is the Talalip's front yard. Where their reservation is, where their winter villages, which are permanent villages, were at treaty times and where they exercise treaty rights. The Suquamish Tribe was found to have fishing rights in a area described by Judge Bolt in a somewhat broad manner as including the waters of Puget Sound north to the Canadian border. And south down to? Excuse me? South to Vashon Island. And that's not on here. Vashon is a little bit south. Your Honor. At no time did he call out the specific waters we're dealing with here. Although he did so in numerous other cases and including in the Talalip situation. I've also handed up ER 96. Which is from a report by Dr. Barbara Lane who was the chief anthropologist in U.S.V. Washington. ER 96 is the map that indicates where the Suquamish were fishing at treaty times. And I know it's a little hard to read but the small numbers over on the west side of Puget Sound and in and around Bainbridge Island and Kitsap Peninsula indicate the types of fish and shellfish that were taken. None of those places are anywhere near the places on ER 45 that are at question in this case. And the reason there are no locations on the map where Talalip's fish is because the Suquamish did not fish there at treaty times. Well, let me ask you this. As we have held, the Suquamish UNA does not follow that the Suquamish must have regularly traveled through the west side of Whidbey Island en route to the northern tip of Vashon Island in the south, the Frazier River in the north, and river mouth to the east. In other words, how can this case be included in the UNA because the tribe likely would have traveled through them en route between its uncontested usual and accustomed fishing grounds? The Lummi case, of course, has different facts and different anthropological information. And this court has struggled with and just recently struggled with what's called the eastern portion of the Strait of Juan de Fuca and has been that there was no evidence of fishing or even travel on the east side of Whidbey Island, that's Saratoga Pass, and the southern part of Possession Sound. So in this case, there's no evidence that the Suquamish went out of their way, Your Honor, to go over there, which is easterly, to head to the Frazier River. If you wanted to head to the Frazier River, you just could shoot north through the north through Harrow Pass and you'd end up in Canada eventually. But it would have been out of their way to divert even more easterly, and there's no evidence that they did so. Well, what about the southern portion of Whidbey Island? The southern, there's a small southern... Where the inlet bays that were dealt with by Judge Martinez. Right, the... On the west side. The bays on the west side, which we named in our proceeding, simply have no evidence to show that they ever fished there. Well, what do we do with the state? I think it was Dr. Lane, when she said, well, they went to Whidbey Island to fish. Yeah, isn't that dispositive? I mean, Dr. Lane also observed more generally that Suquamish traveled farther for fish than any other sufficient supplies when confined to those fisheries on the west side of the Sound, where the Suquamish lived. She did, she did make general... So, according to Dr. Lane, the Suquamish traveled widely in the Puget Sound area, either harvesting resources or visiting in-laws. As did all the tribes. That's a general statement that doesn't get specific as the court, in this case it was Judge Craig, who bodies of water, bays, inlets, rivers, and so on, and none of this kind of early, general, vague description of, yeah, they fished from here to there, without any real understanding of what that meant, in terms of constricted water. So are you saying that's no evidence? Even though I'm telling you it's some evidence? Are you saying it's no evidence? It's not evidence to make a general statement, Your Honor, with all due respect. And she herself said that fishing while traveling doesn't make a usual and a custom fishing place. That irregular or sometime visits don't make a regular UNA place. They may have gone to certain places, they may have done some fishing, but that doesn't rise to the level of a usual and a custom fishing place. On the west side, wouldn't they go, would you travel... To go up to the Fraser River, couldn't you also go up on the west side of Whidbey Island, up through that street? Through the Sound, I guess it is? The west side, you could. Right? Yes, whether they did or not, we don't know. But you could go up the east side of the peninsula and then cut across through open waters, or you could cross over Admiralty and go up the west side of Whidbey. But we're talking here the east side of Whidbey, to which there's no... But don't we have to look at each of the areas distinctly? That's basically our position, Your Honor, yes. Right. And if you look at the east side... That would be Possession, Port Gardner, and the mouth of the Snohomish River. That's correct. Exactly. That's roughly the area. I was just going to say that the evidence there seems pretty supportive of what Judge Martinez did. I'm not sure what evidence that would be. Dr. Lane's report. Well, Dr. Lane said... Testimony, I can't remember which it was. I can find it really quickly. You have to see what she said in context. She said in her report, and this is at page 28 of our brief, or ER 75, the Suquamish held the west side of Puget Sound, from near the mouth of Hood Canal, south to Vashon Island. Their territory included the land around Port Madison, Liberty Bay, Port Orchard, Dye's Inlet, Sinclair Inlet, and south to Olala. It also included Bainbridge Island, Blake Island, and possibly the west side of Whidbey Island. It is difficult to establish the precise nature of the use of the west coast of Whidbey Island. It was only later that she made some generalized statements about possibly visiting other places, but that was her key finding that I just quoted, and presumably Judge Bolt knew that and had heard her testify and written her report that they were a west side truck, and that's where they fished, and that's where their usual and accustomed fishing grounds were. Well, in terms of Dr. Lane, that Dr. Lane, you want us to now consider a 2011 affidavit from Dr. Lane? Yes. But isn't it really what Judge Bolt thought back then, not what Dr. Lane said she meant to, what she wanted him to think? The intent of Judge Bolt is key. So we have to go on his head. So I don't know why we would consider what she's saying in 2011, what she meant. Because it's what Judge Bolt thought. In the Muckleshoot series of cases, this Court held that the record was not frozen and that subsequent declarations could be considered, particularly to observe or elucidate geographic locations. That's not what she's doing here. That's the exception for geographic locations. But that's not what she's doing here. Well, I think what she's doing is saying that when I say, as she did say in her report, that there may have been some fishing at the mouth of the Duwamish and Snohomish, that that was not meant to point them out as a location of UNA places. Your Honor, I have to point out that when she said this, she said modern Suquamish have attested that Suquamish traditionally fished at the mouth, not informants from 1855. And she said that modern informants said the Duwamish and Snohomish rivers. And this Court held in another case that involved the Suquamish attempts to expand that they had no rights in the Duwamish River. And so far, every time this Court has looked at some claim Suquamish makes based on these kind of generalized statements, you've found there is no specific information that would support the finding that that's a usual and a custom place. I'd like to reserve the remainder of my time. Sure. Thank you. It's supposed to be a whip. That's okay. Is there a thing here to do that? That's okay. I'm fine. I'm fine. May it please the Court. Yes, Your Honor. It's only because I can't see. Don't move or I'm going to stop. That's it. Thank you very much. May it please the Court, Howard Arnett for the Suquamish Tribe. And with me at council table is Rick Bellis, who's the Director of the Suquamish Tribe's Legal Department. Let me start by responding to Judge Callahan's question and line of inquiry, Mr. Morsad, regarding the Lane Declaration, the 2011 Lane Declaration. In the Muckleshoot case, there was an effort made to have a latter-day statement, testimony in the form of a deposition 20 years later in 1994-95 by Dr. Lane entered into evidence to help her show what was intended by her statement. This is regarding the Lummi Tribes, usually accustomed fishing areas, the south end of which is described in Judge Boldt's order and in her report to Judge Boldt in the same language, the present environs of Seattle. What does that mean? And the Lummi's offered the evidence, or one of the participants in that case offered the evidence of Dr. Lane's declaration or deposition testimony 20 years later to say, I'm at Muckleshoot, Washington. That is the present environs of Seattle. It wasn't admitted because it was held by this court and by the trial court to be latter-day testimony, as you pointed out, that does not elucidate what was in Judge Boldt's mind in 1975 when he was crafting that language. It isn't helpful at all. Now, it's true the Muckleshoot court did say that some additional evidence can be obtained about geographic issues. And what they did was they allowed the parties to go get a geography professor who testified about 1975, what would have constituted the environs of Seattle. And the conclusion was somewhere around Edmonds, Washington, immediately north of the city of Seattle, would be the northern end of the environs of Seattle in 1975. But that was per the testimony of a geography professor, not Dr. Lane's latter-day testimony. Well, is the statement by Dr. Lane in the record that contemporary members of the Suquamish and other tribes mentioned to her that the Suquamish traditionally fished the contested waters enough to prevail under Muckleshoot Step 2? Yes. Or must we only look to concrete treaty time evidence to determine if any evidence? Well, that was part of the basis of Dr. Lane's opinion. She was giving opinion testimony, and her opinion was, and it was also based on treaty day reports, treaty time reports from around 1856 of the Suquamish going to the east side of Puget Sound to fish the large rivers in the late fall and the winter because their own areas were really bereft of salmon resources at that time of the year. They live in an area, and this is clear in the record, on the Kitsap Peninsula, which doesn't have a lot of streams. It doesn't have big streams. And so they don't have access to year-round resources, which is why they were characterized by Dr. Lane as unique among all the tribes in the case area as having to travel the most and travel the farthest to obtain the resources necessary to maintain their tribal lifestyle. And so their usual and custom fishing areas are among the farthest reaching of all the tribes in the case. So what Dr. Lane was saying, and she also said this with regard to the northern sound areas, which this, by the way, needs some clarification. This case and the whole description by Judge Bolt in a bench ruling in early April of 1995 and eight days later in a written order by Judge Bolt all arose in the context of a very short and intense litigation about a herring fishery. And what happened was the Suquamish tribe and several other tribes in March of 1975 proposed herring fisheries based on their treaty rights. Suquamish had not yet had an adjudication or a determination by Judge Bolt of exactly where their UNAs were. So they submitted proposed regulations for Suquamish treaty herring fishing. They attached the map. This is the map that's before you. It's a map of showing four areas in Puget Sound in the case area, areas one, two, three, and four. Those actually correspond to state of Washington management areas. It should have this document. Yes, it's page 65. Yes, it's Mr. Morrisett's. It's the Tulalip's ER, page 65. This is the map, and it's actually discussed quite a bit in the record and in the transcript of the proceedings before Judge Bolt on April 10th and April 11th of 1975. This is the map that was attached to the Suquamish tribe's herring fishing regulations. And what Judge Bolt did when this map and the herring regulations were submitted to him on April 4th is to say this is prima facie evidence of the areas that this tribe claims as usual custom fishing areas under their 1855 Treaty of Point Elliot. So he said it's prima facie evidence, and I'm going to accept it. No tribe has objected to it, and a tribe presumably would if they didn't agree that the Suquamish had been in all these areas, which are 1, 2, 3, and 4, all four of them, from the bottom of Puget Sound at Olympia and Tacoma all the way up to the Straits of Juan de Fuca, all the way up through the San Juan Islands, all the way up to the Fraser River. Then what happened is the state of Washington said we have an issue, Judge Bolt. We want to be heard on whether Suquamish actually went in sufficient frequency and sufficiently often to justify establishing UNAs in these far northern areas. So what happened then is on April 9th, the state of Washington, through the Assistant Attorney General, Mr. Solomon, engaged in extensive cross-examination of Dr. Lane regarding her report, her December 14th, 1974 report, which was already entered into evidence, and that's in the record. She had testified on direct on the extent of Suquamish fishing throughout the case area, but especially in these northern areas, the San Juan Islands. The state of Washington grilled Dr. Lane about whether Suquamish actually went to those areas, how often they went to those areas, how frequently they went to those areas. Dr. Lane testified they went there often. She said I can't tell you if it was every Sunday. Nobody was sitting around in 1855 recording exactly where tribes went and how often they went. But she said, as my opinion, they went there frequently, continuously, enough to justify a holding that this is a usual custom fishing area for the Suquamish tribe. So what Washington was doing in that abbreviated hearing about herring fishing on April 9th and April 10th of 1975 was challenging areas 1 and 2, not areas 3 and 4, areas 1 and 2. Suquamish itself is located in area 4. It's right across from Seattle, just north of Bainbridge Island. One of the number 4s is just to the left of that, just to the west, is where the Suquamish Reservation is now, sort of northern central part of the Kitsap Peninsula. The herring was entirely about the state's challenges to area 1 and 2. But it was clear when Judge Bolt issued his bench ruling on the 10th of April in which he said, I'm declaring that areas 1 and 2 are UNAs. In the face of Washington's objection, Washington's challenge to Dr. Lane, I'm siding with Dr. Lane and I'm holding in favor of Suquamish regarding areas 1 and 2. That did not mean, as suggested by Tulalip, that that bench ruling was intended to delimit, that's the word they use in their briefs, to delimit the Suquamish UNAs in terms of areas 3 and 4, especially area 4, which is where they live. And you can tell- When we look at these other cases, I'm a little bit curious about when we look at the other cases, because I was asking them about, is it the upper Sagitt- Sagitt. That where the Ninth Circus distinguished Saratoga Passage and Sagitt Bay, which it found they were not within the Suquamish UNAs, and distinguished that from the, quote, and the mouth of the Sonomish River, where the Suquamish were known to fish seasonally. So that's not law of the case here exactly, but what do we do with that? Well, it's an observation. It's an observation, certainly. I think what the Ninth Circuit was doing in that case was saying, contrary to the position of Tulalip, our holding is not that everything east of Whidbey Island is out for Suquamish and their UNAs. What we're saying is that Saratoga Passage and Sagitt Bay are out. Saratoga Passage is not the entirety of the east side of Whidbey Island. In fact, Possession Sound, as the Ninth Circuit pointed out in its text and in the footnote, Possession Sound and the mouth of Sonomish River and Port Gardner Bay, those are all technically on the east side of Whidbey Island, but they're below Saratoga Passage. Well, if we're in Muckleshoot II, I mean, if we're in the second prong, then Tulalip has to show no evidence, right? Correct. So I asked them, what do I do with Dr. Lane's statement in the record that the Suquamish traveled to Whidbey Island to fish? Is that dispositive of some evidence or not? That is absolutely dispositive of some evidence. Whidbey Island is a very large island. It is a large island, Your Honor. I mean, Whidbey Island, I mean, you go way up north, you could go. Yeah, that's true. That's true. Whidbey Island. It's a big island, Your Honor. It's a big north-south island. But if they're not fishing at Skagit Bay, which is up north, and they are fishing at Possession Sound, Port Gardner and Sonomish, which are on the more southern end of Whidbey, doesn't it suggest that they took the southern passage around the island, which means they should have been fishing at Mutiny and Cultus and so on? Mutiny and Cultus are on the west side. Right. But if you're going to go east and go to the mouth of Sonomish, you have to go from west to east. Correct. And you're not going around the north end of the island through Skagit Bay. You're going around the south end. You have to be taking the southern passage, because there's no other way unless you're crossing the island, unless you're portaging across the island. No, you're crossing around the south end of Whidbey Island into Possession Sound. And if you go to that southern end, then you're going through Mutiny Bay and past Cultus Bay in order to get there. Isn't that right? I believe there are – well, I have my large map of Washington. But Cultus Bay, I believe, is one of those. It's very close to the southern tip. You're going by there. You're actually – when you're traveling from Suquamish itself, you're traveling northeastward to get toward the bottom of Whidbey Island and into Possession Sound toward the mouth of the Sonomish River, which is the whole object of going in that direction. Okay, so that's a northeastern direction from where the Suquamish live. Correct, correct. But their ancestral homeland includes, as stated by Dr. Lane, and actually it's the map that Mr. Morissette referred to, that's really the entire northern portion and central portion of the Kitsap Peninsula. And it's not far from the Kitsap Peninsula, across maybe five nautical miles across to Whidbey Island. And what Dr. Lane actually said when she said it's possible that the Suquamish lived on Whidbey Island, she was talking about their homeland, not necessarily their fishing rights. Obviously, if it's their homeland, if they had winter villages there, which she said she didn't have any documentation of, although there was a document in the record from 1849 that said that Suquamish were observed on Whidbey Island. It wasn't clear whether they were living there year-round or whether they were there simply to fish. For purposes of UNA, they only need to have been there to fish and to establish their living on Whidbey Island. So when Judge Bolt defined the customary and usual areas in this map, is it your position that when he did that from north to Fraser, south to Vashon Island, in this area that's all numbered four, the four areas, the two at the top and then one to the right and then one down at the bottom, is it your position that all that area there in the sound is part of the Suquamish? What he said in his written order of April 18th, this was eight days after his bench ruling in the hearing proceeding, he issued his written order on Suquamish UNA. He broke them into three distinct segments. Number one, marine waters of Puget Sound north of the northern tip of Puget Sound, up over the Fraser River with the northern point of Vashon Island, the southern terminus. So everything south of the northern tip of Vashon Island, which is just out here, everything south is out. There may be Puget Sound, but Judge Bolt didn't include it in Puget Sound for the Suquamish. Marine waters north. He had a second distinct category of UNAs for the Suquamish, and those are the streams, meaning fresh water, the streams of the Kitsap Peninsula or any of the streams that drained into the western portion of Puget Sound in that area that he had just set aside as Puget Sound as a UNA for the Suquamish. Then there was a third distinct area, and that's Hood Canal, which is that fishhook on the map to the west of Puget Sound on the west side of the Kitsap Peninsula. So there were three distinct areas, and I think Talala's brief has suggested that in the second area where he is reserving UNAs on the streams that drain into the western portion of Puget Sound north of Vashon Island, they're suggesting that Suquamish was limited by Judge Bolt. He intended to limit them somehow to the marine waters on the west side of Puget Sound. That's not what he said. He said the streams, meaning the streams that he's identifying, the freshwater streams that drain into the Puget Sound. So our position is yes, Puget Sound means Puget Sound, although the Skagit case has just determined that Saratoga Passage and also Judge Martinez in this proceeding, Holmes Harbor and Penn Cove, which you can't get there except through Saratoga Passage and Skagit Bay, are out. The rest of it is in, all the way to the Fraser River until some other proceeding challenges that. Right now, this case is all about whether Possession Sound and Portnagardner Bay and the mouth of the Suquamish River, plus the bays on the west side, the southwest portion of Whidbey Island, are in that broad definition by Judge Bolt of Suquamish UNA, everything north to the Fraser River from the northern tip of Vashon. How about the northern part of the west side of Whidbey Island? The northern part of the west side of Whidbey Island? Yes. Should be in. Absolutely should be in. But he didn't deal with that. Did not deal with that. No, he did not deal with that. Why is that in? Because it's in Puget Sound. It's in Puget Sound, north of the tip of Vashon Island, all the way to the Fraser River. And I'm certain it's in because. So then why doesn't that reasoning also apply to Useless Bay and the others? It does apply. I mean, they are all. Answer my question. The challenge, and Judge Martinez held that the bays, specific bays that were challenged on the west side of Whidbey Island are in, that they are in the Suquamish UNA. They're in the sense that Judge Bolt intended them to be in. And that's because, in part, this is a route, as you pointed out, if they were not going up the east side of Whidbey Island to get to the Fraser River, to get to the San Juans, where Judge Bolt has already determined they have usual custom fishing places. That's clearly settled. And that was litigated in that proceeding, the herring proceeding in April of 1975. They're going up the west side. And they're going up there frequently. They're going up there continuously. If they're going up to the San Juans and to the Fraser River often enough, for those areas to be UNAs, certainly going by Whidbey Island all the way from the bottom to the top on the west side, which is probably the way they went, this Court has already held regarding Lummi, if they're coming down from the north, Admiralty Inlet is the name of that body of water, that they are coming through Admiralty Inlet. And, therefore, that is certainly part of what Judge Bolt intended for the Lummi's. So if the upper set Skagit said that the Court held that travel along the west side of Whidbey Island through the Saratoga Passage, if that wasn't where they went, how else would they get to the northern tip of Vashon Island? Saratoga Passage is on the east side of Whidbey Island. Okay. But then if they didn't go there, then how else would they have traveled to the northern tip of Vashon Island and the south to the Fraser River to the north? They would have gone up the west side of Whidbey Island, which is Admiralty Inlet. And Vashon Island, the northern end of Vashon Island, is the southern terminus of the Suquamish UNA in Puget Sound. It runs north from there, all the way through Puget Sound, through the San Juans, up to the Fraser River. And the testimony is clear that they went there often. They went there frequently, and they fished along the way, enough to establish that it's the entire area is a UNA, and less specific parts of it, as this court has ruled, regarding Skagit Bay and Saratoga Sound, and Judge Martinez's hill regarding Pencove and Holtz Harbor, on the east side of Whidbey Island. That couldn't have been in Judge Bull's contemplation because there was no evidence from Dr. Lane that they actually went there at any time. Unlike this case, where there's abundant evidence from Dr. Lane that they went to the mouth of the Snohomish, they went through Possession Sound, Port Arthur Bay, to get to the mouth of the Snohomish. They needed to, they had to, in late fall and winter. And there's testimony from the Indian agent at the Port Madison Reservation in 1856 that because they weren't able to leave the reservation, this is right after the treaty, because there were hostilities in the southern sound, they were starving. And they were starving because they couldn't go to the big rivers on the east side of Puget Sound. These are big rivers. They're flowing out of the Cascades. And we don't have any rivers like that in Snohomish country, small rivers. That's where they had to go to get their winter and fall food. And that's what they did, and that's why those are UNAs. Your time's up. Thank you very much. We appreciate your argument. May it please the Court. I'm afraid I have to correct Mr. Arnett. He said that areas one, two, three, and four had been determined to be UNA in the 1975 proceeding. I want to quote directly from the Court's order. The Court finds that a primary facie showing, has been made that travel and fishing in the Snohomish tribe through the north sound areas, that is, areas one and two, as designated by the state, was frequent and also regular, not merely occasional, and the application of the Suquamish for such a ruling is granted. He did not say and, areas three and four. But he already defined. When did he define the area from the Fraser River down to the northern end of Vashon Island? That was in his final order on their UNA. What does that mean? He didn't define it beyond it, and that's why we're here, Your Honor, is it did not call out specific places, and we've seen through the history of this case that these rather broad statements, unfortunately, because it's difficult, have to be parsed out and examined more carefully. Very telling in this case, Your Honor, is the fact that for 30 years, 30 years, the Suquamish did not attempt to fish in these contested waters. Which ones are you talking about? The ones we're talking about in this case, Possession Sound, Snohomish River, Port Gardner. But that doesn't negate that they may have a right to do it, though, right? It doesn't necessarily negate it. I think it shows what they understood, as did everyone else who was there. Well, we're concerned with what Judge Bold understood. And I think that's what he understood. What he had before them, what before him, was the testimony of Dr. Lane indicating that they were a west side tribe. What about his statement that the rivers and streams flowing into the west side would be the sound from the Kitsap Peninsula? What does that suggest? Well, definitely whatever rivers are there, and there are some small rivers, they would have UNA in. And he often added, but didn't there, and adjacent marine waters. I don't know why he didn't, but that would be a logical extension of that. Right. But he didn't say that, so I don't know what it means exactly. That's not contested by us at this point. But the Suquamish would have traveled from the northern end of Vashon Island and from the rivers and streams on the Kitsap Peninsula. If they were going to go north up to the Fraser, it seems reasonable, they would have gone through the Admiralty Inlet way, past Whigby Island on the west side and the inlets and whatnot. They would have gone, it's logical, they would have gone through Admiralty, correct. And they could have touched the west side of Whigby Island. As Dr. Lane testified, they went to Whigby Island to fish. Well, occasionally, I guess. It's not clear that they went there in any specific place. And certainly the east side in these specific constricted waters of possession, Sound and Port Gardner, were not a necessary place for them to go to get to the Fraser River. In fact, it's out of the way, Your Honor. In Judge Martinez's order, he quotes extensively from a portion of Dr. Lane's report, which seems pretty, you know, like there was some evidence before Judge Bold regarding possession sound at the mouth of the Snohomish River, and I forget the other area that's down there. Judge Martinez relied on it. No, I'm not clear which language that is, but I believe we've quoted accurately her findings that they held the west side. She said that specifically. And that she did not name in her testimony any of these specific waters, and she did not show any place names for any of these, for land around these specific waters. That's ER 96, which is very telling. The tribe had no place names for the land around an area. It's not at all likely that it was a usual and accustomed fishing place. In his order, Judge Martinez quotes from Dr. Barbara Lane, I think it was exhibit, United States exhibit 73 at pages 1 and 2, 4, 5, 11 through 16, and there's one little statement there that caught my eye, which she says, it is my opinion that the foregoing reports written by Page in the fall and winter months of 1856 document the fact that the Snohomish were accustomed to harvest their fall and winter salmon supplies at the rivers on the east side of Puget Sound. And then she goes on to say, modern Suquamish as well as neighboring Indians have attested that the Suquamish traditionally fished at the mouths of the Duwamish and the Snohomish Rivers as well as adjacent marine areas. Yes, and this court has found that that doesn't make a usual and accustomed place for the Duwamish River, the fact that they did occasionally fish there, and I think the case is the same for the Snohomish River. Now, that evidence was before Judge Bolt, wasn't it? It's in her report, and that exhibit, was it 73? Yeah. Yes, that was before Judge Bolt. Okay. Anything else? Give me just a moment here. I think that's all, Your Honor. Okay, thank you very much. Very interesting case. We appreciate your counsel's arguments. The matter is submitted, and the court's going to be in recess for ten minutes.
judges: Paez, Bybee, Callahan